at all, Messrs. Wolfe, DePrince, and Ramkumar. Am I even coming close? That's right. How does your client pronounce his or her name? Yeah. C-U-L-A-J-A-Y. How do you pronounce that? Culajay, Your Honor. Culajay. Is it Hernandez Culajay or just Culajay? Hernandez Culajay. Culajay. Thank you very much. May it please the Court, my name is Tobias Wolfe, and with my colleague Michael DePrince, we are here representing the appellants. I will be presenting the Flores issue. Mr. DePrince will present the balance of the issues in this case. And we ask to reserve two minutes of rebuttal time from Mr. DePrince's time. That's fine. The Flores Settlement Agreement is a contract. It binds the United States, its agencies, and its officers, and defines their duties and obligations in an area of plenary and unique federal concern. The duties and obligations of the United States in relation to the detention, confinement, and release of minors, in this case a six-year-old girl from Guatemala, when they arrive at the southern border of the United States, are seized by federal agents and are processed for purposes of determinations about detention and asylum. We've got the facts. Looking at the Flores Settlement, I guess the focus here has to be that consent decree 24B. Yes, Your Honor. Normally you think of if you have a problem with a consent decree that you have to go to the court that entered the consent decree. But 24B does have language. Any minor may seek judicial review in the United States District Court with jurisdiction and venue. And then in such an action, the United States District Court shall be limited to entering an order solely to affect the individual claims of the minor. But can that consent decree grant subject matter jurisdiction? Your Honor, let me answer that question in two ways. First and foremost, the relevance of the exposition that I gave just a moment ago is that this is an agreement that is enforceable as a matter of federal common law. It has binding effect as a matter of federal common law. That means that claims arising under that agreement are claims that arise directly under federal law. And as the Supreme Court held in the Illinois v. City of Milwaukee case, claims arising under federal common law are directly covered by Section 331. There's an old Second Circuit case, Mastermates from 82, which said, you know, the consent decree entered into Ohio. We don't have subject matter jurisdiction. Yes, Your Honor. So several distinct issues come up in the enforcement of an agreement like the Flores Agreement. The first is the proposition that as a general matter, one district court will not enforce directly the injunction of another district court. That issue is not implicated in this case. The relief sought here is not a contempt citation against the United States government for a violation of an order relating to the minor plaintiff in this case. Cases from the Supreme Court on down have consistently said, including the Flores District Court in the Ninth Circuit, that consent decrees are essentially contracts. They have some aspects of an order or an injunction when they're incorporated into the order of a court, but they are essentially contracts. And the issue of an injunction to enforce an injunction would only arise if a plaintiff sought to do something, which is not an issue in this case, which is to seek penalties for a violation of a specific order entered by the issuing court. Now, there's a separate issue. And the issue is, insofar as a consent decree is a contract, are there forum selection clause considerations about where that contract can be enforced? And, of course, the Supreme Court has long held that forum selection clauses in contracts are enforceable. That's the Carnival Cruise Lines v. Chute case. And most consent decrees will either say by their own terms that jurisdiction and enforcement is reserved to this issuing court, which constitutes a forum selection clause as to where that contract can be enforced, or they will simply leave the matter unaddressed. I misspoke. I think the case I actually was thinking about was a Stiller case out of the Second Circuit, dealt with Ohio, other mastermates also dealt with this subject. But there the Second Circuit held that a judgment that was entered by the Northern District of Ohio, awarding damages for patent violations and enjoining further infringement could be registered in New York, but the injunction, you've got to go back to the Northern District of Ohio. You can't come here in order to enforce it. Precisely so, Your Honor. And if the remedies sought were contempt for a violation of the Ohio District Court's injunction, then the Ohio District Court is the one that has to issue that remedy. But if the remedy sought is simply a violation of a contractual obligation on an ongoing basis that the United States has undertaken to be bound by, that is a remedy that can be sought in any court that has jurisdiction over the settlement. If I may, the Supreme Court's decision in the Coconin case, which the government relies upon very heavily, that case doesn't say that settlement agreements can only be enforced in the rendering court. That case says that ordinarily settlement agreements are enforceable only as contracts. And the special circumstance of the issuing court reserving jurisdiction for itself on an ancillary basis to issue orders Which is what didn't happen in Coconin. That's correct, which is why in that case there was no independent basis for subject matter jurisdiction over the complaint, over the claim under the contract, and therefore there is no basis for jurisdiction in federal court. Here, this is a contract which I believe the government concedes is enforceable as a matter of federal common law. And as a consequence, there's federal question jurisdiction. So you haven't focused on the relevant distinction from some cases like Coconin and patent litigation where the federal government isn't a party to it. We have this question about whether it would get enforced in state court or federal court. But the federal government's a party to it. It would be exceedingly unusual to expect that this would be brought in state court. And then if it's going to be brought in federal court, it's really just a matter of venue as to which federal district court. So that seems to be really an issue when we're dealing with consent decrees that do not involve the U.S. government as a party because this is a Clearfield Trust kind of federal contract with federal common law. I think that's exactly correct, Your Honor. And if the panel is of that view, I'm delighted. And then the only question is what is the appropriate venue in which to have this claim brought? And as we've explained in our brief, the suggestion by the court below and the government that this word jurisdiction in paragraph 24B refers to an independent basis of subject matter jurisdiction, number one, that's satisfied here. Number two, with better reading, is that it refers to personal jurisdiction, which is not disputed in this case. And the only question then is venue. And under 28 U.S.C. section 1391E, venue lies in the eastern district because the plaintiffs are residing here. They're subject to detention currently in the Burks facility. That means that a substantial amount of the events giving rise to their claims, namely that the minor 6-year-old girl's detention is in violation of the government's FLORES obligations, is happening as we speak in the eastern district of Pennsylvania. To be clear, you view those as two distinct bases for subject matter jurisdiction. That is the creation of a federal right in this agreement by virtue of the government itself having committed to certain provisions. And separately, that this is a contract that is governed by federal common law. You're arguing those are two different alternative bases, both of which would provide subject matter jurisdiction? I believe the answer is yes. Allow me to clarify one point. The original basis of subject matter jurisdiction here is the federal question statute. And the basis of that jurisdiction is these are claims that arise under federal common law because of the uniquely and pervasively federal nature of this contract, which binds the United States government. That is a direct line from Clearfield Trust. A second possible basis for independent subject matter jurisdiction would be an extension of the principle of ancillary jurisdiction. That, frankly, is how most of the federal district courts that have addressed this question have viewed the matter. And I actually think it's a much more straightforward proposition to say that the court need not reach questions about how ancillary jurisdiction operates in this setting. There is original subject matter jurisdiction under 1331. These are federal claims, and as Judge Bibas made clear, the idea that the alternative here is to file these claims in state court is obviously rather foolish. And the only question, therefore, is whether there is a venue in the Eastern District, and under Section 1391e, the answer is clearly yes. Normally a consent decree is a settlement that contains an injunction. And isn't that what we have here? I would say, Your Honor, let me answer that in two ways. First of all, sometimes a consent decree involves an injunction, namely an executory order on an ongoing basis that demands of a party that they take or refrain from taking certain actions. That's not always the case. In some of the cases that the government has cited, for example, the settlement is simply a damages award, and the court retains jurisdiction to administer any disputes that might arise under that settlement. So I don't think that's an inevitable feature of these decrees. But once again, and I want to make sure to address this point, Your Honor, it's informed a couple of your questions. Appellate courts and indeed the Supreme Court have consistently said that consent decrees are best understood first and foremost as contracts. That is the fundamental principle of the Kokonin decision. There are circumstances where the court that issues and retains jurisdiction over the consent decree has occasion to enforce it through the use of its injunctive powers. Where that is so, where a court issues an order and there's an argument that a party is in violation of an ongoing order, the place to seek enforcement of that order through contempt sanctions is the court that issued that order. Was there an injunctive element of the consent decree entered in 97? To be sure, Your Honor. And the injunctive element speaks to questions that have either been addressed to the district court in California as to class-wide relief, which that court reserved exclusively for itself and the administration of this agreement, as distinct from the individual circumstances of newly arriving minor migrants, like the six-year-old plaintiff here, which are obviously not the subject of any previous applications for enforcement in the Central District of California. I empathize with your position, but my concern is that when I, the only thing I'm really finding that says, okay, we have subject matter jurisdiction, is a Northern District of Illinois district court case, but it looks like the Second Circuit in the Stiller case, and maybe in Mastermates, the Eighth Circuit and the Eleventh Circuit seem to think that when you have an injunctive element in a consent decree, you've got to go back to the court that initially entered the consent decree. Your Honor, allow me to respond to that in several ways. First of all, most of the cases that talk about ancillary jurisdiction as a basis for enforcing a consent decree are not talking about excluding other jurisdictions from the possibility of entertaining an enforcement action. They're talking about whether there is an independent basis for jurisdiction to enforce the agreement in the first place. These are cases where the parties have either not argued or the court has found that there's no other independent basis for subject matter jurisdiction. That's quite different from the case here. This is squarely a federal question case enforcing a contract which is enforceable as federal common law. The only question that arises, and I think this flows directly from the Supreme Court's decision in Kokonon, the only question that arises when there is a separate and independent basis for subject matter jurisdiction, as is true here, is is there anything about the relief sought that indicates that it's not appropriate for another district court to administer that relief as a contract enforcement action rather than having to go back to the original issuing court and seek an enforcement of an ongoing executory injunction. And in this case, what the issuing court did with Flores is to draw a very clear distinction between class-wide relief which is enforced on an injunctive basis from the issuing court and the circumstances of individual plaintiffs, individual class members, which are the subject of contractual obligations that the United States has undertaken. And that's what's at issue in this case. Thank you very much. Thank you, Your Honor. Good afternoon, Your Honors, and may it please the Court, Michael DePrince for appellants. As stated by my colleague, Mr. Wolfe, I will be addressing the balance of the issues presented in this appeal. And first, I would like to begin with the claim regarding the statutory authorization to subject these individuals to MPP. So your fourth, your third claim. Third claim. Correct, Your Honor. Thank you. And first, I'd like to address jurisdiction. The district court believed that appellants attacked ICE's decision to place them in standard removal proceedings and that this was necessarily an action taken to remove an alien under section 1252b-9. Our position is that forced relocation to Mexico under MPP is a custody determination and that this presents questions of law which do not arise from removal proceedings for purposes of 1252b-9. Appellants do not challenge any part of the process by which their removability will be determined, and they instead claim that the government lacks statutory authority under 1225 to forcibly relocate them to Mexico until their removability is ultimately determined. And because custody determinations are not within the providence of immigration courts, this claim is precisely collateral and should have been heard. In Jennings, the court suggested that a challenge to any part of the process by which removability will be determined would fall within b-9. I understand you're trying to draw a distinction between the return and removal, but why isn't the return part and parcel of the removal process? Even if it were part and parcel of the removal process, Jennings instructs that the guiding analysis is whether questions of law  and these questions of law relate to the statutory authorization to remove them to Mexico during the pendency of their removal proceedings. And Jennings also makes clear that challenges to detention determinations, such as in Jennings' prolonged detention, do not arise from removal proceedings. Is that your answer? You may be asking the same question. Are you then turning to an argument that it would be rendered unreviewable? Is that your point? That would be the point. At the moment that they are returned to Mexico, there will be a harm that is incurred, and there is nothing that can be addressed through the PFR process that could ameliorate that harm that is incurred at the moment of being returned forcibly to Mexico. I'd like to connect that up to the fourth point, which is the convention against torture point. You've mentioned withholding against removal below. The APA is thrown in there. What's the gist of the harm? The government's response is, well, it can't be withholding removal because this is not about removal. But is that claim fundamentally about the risk of harm in Mexico versus the risk of harm in Guatemala? Because that seems central to whether under Jennings this, in fact, is going to escape review later or not. I think that there is risk of harm in Guatemala as well as Mexico. But the issue, as the government concedes, is that the government's non-refoulement obligation is non-discretionary, and the act of moving someone out of the country, whether characterized as a return to Mexico forcibly or a removal to Guatemala altogether, is a refoulement decision by removing them out of the boundaries of the United States. So maybe remove is the wrong word. Extrude, other words, get used for the treaty. But the point is, by putting the person back in Mexico, you're saying it's a violation of CAT. But it's also then not a CAT issue that would then be reviewable through the removal process because it's a now or never kind of review under four. Your fourth claim piggybacks on Mexico, then. That would be correct, Your Honor. And as you state, it would be effectively unreviewable. Once they are placed in Mexico, they would not be able to bring any claims in a PFR process until eventually a final order of removal to Guatemala issued by the BIA. And at that point, the harm is already incurred. And that is the problem of reading 1252A4 the way the district court did, is that it leaves them without a forum to bring their claims of harm. And it also does not align with the purposes of the CAT statute itself, which is not to return people to any place in which they face a risk of harm, not just a removal to a home, country, or a place. So let's talk. You resist the Ninth Circuit's approach in JEFM when we're talking about what the meaning of B9 is here. And you say the circuit decision in 2016 is superseded by Jennings and Justice Alito's plurality opinion in 2018, correct? Yes, Your Honor. And so the analysis you want us to apply is whether this is challenging part of the process by which removability would be determined. And then we've got a question about what arising out of means, and it doesn't mean the very expansive one, but is it part and parcel of the process? I think that JEFM equally mandates that claims that are independent are collateral to the process, even notwithstanding. So your reply brief takes the position we've got to ask, is it independent, is it collateral? It's not clear to me that it's either or whether it's both, but that's the terrain we have to ask on. So I'm wondering why that doesn't at least limit the scope of your second point, which is the right to counsel point, right? You have a statutory right, but that statutory right, I believe, is geared towards your ability to litigate your removal. But that's reviewed all the time when we review a decision granting or withholding denial of removal or cap relief. Your constitutional claim, I can't tell whether that's just about the removal decision at the end or whether there's also a distinct component of it that's about the being put back in Mexico temporarily. Can you explain to me or unpack, are there two constitutional claims here? Is the constitutional claim about what's happening now to Mexico, or does it bear on your eventual return to Guatemala? I think first, Your Honor, it does not bear on the eventual return to Guatemala. By being placed in Mexico, there is effective termination of a right to counsel, and there is no more avenue for those individuals to be represented by counsel who are here in Reading right down the street from where they are currently detained in Berks. At the moment that they are separated from counsel, there will be nothing that an appellate court, whether that's an appellate court or a court of appeals on a PFR, could do to reverse that harm that was incurred at the moment of separation. But if Jennings is the test, and you suggest that Jennings might supersede or adjust how we read Chávez and some other presidents, isn't it part of the process by which the removability will be determined? Why is this something that if they're denied counsel now, it may be unlawful, but it routinely gets reviewed in a petition for review? Why is this different from your run-of-the-mill? What makes it independent of or collateral to in the way that you agreed in your reply brief was the right test? The types of right to counsel claims that are often brought on a PFR claim involve some kind of ineffective assistance of counsel or something that an IJ did incorrectly, such as denying a continuance to seek counsel, forcing an individual to proceed without counsel, or incorrectly finding a waiver of a right to counsel. That is not what this is. This is a DHS decision to place someone outside the boundaries of the United States, and that in and of itself creates an independent harm. We would be disingenuous to say that it wouldn't have an effect overall on the outcome of the removal proceedings, but that is not the singular claim. The claim is that they will face an independent harm to their attorney-client relationship at the moment of forced relocation to Mexico. Is your primary basis a statutory right to counsel or a constitutional right to counsel? Or both. Or both. It would be both, Your Honors. And the source of the right is located as to removal proceedings, as the government says. However, Jahazeh Woods correctly states that it's the nature of the claim that determines whether a claim arises from an action taken or proceeding brought to remove an alien, and that is what's at issue here, that the legal issues do not arise from the removal process itself. The issues arise from a custody determination that effectively terminates an attorney-client relationship, and that is its own independent harm. Jahazeh says that 1259B9 only applies to final orders of removal. Does Jennings? How does Jennings affect that? Your Honors, Jennings takes a slightly different analytical path in stating that whether the question of law arises from an action taken or a proceeding brought to remove an alien, and the plurality there states this is not an action arising from. This custody determination does not arise from removal proceedings. In that sense, the factual predicate is very opposite here. In effect, it's related to in some way, is it not? It is. And the dissenting justices in Jennings said what the Jahazeh case would say, in that we also don't have a final order of removal here. But the Jennings plurality is equally instructive in that this custody determination does not invoke questions of law that arise from a removal proceeding as intended by 1252B9. Any further questions? Yes. We've been asked by the government to affirm on the merits as to the statutory authorization claim. And you're arguing that they were found inadmissible because they were found inadmissible under 1182A7. B1 still applies, even though they've been placed in standard removal. That's correct, Your Honor. How can it still apply if they are going down, if they've been put into a different category with different treatment? Yes. If I could cite the matter of MS decision issued by the Attorney General, I think that speaks to that very well. The Attorney General recognized that both B1 and B2 applicants may be placed in regular removal proceedings, although by different mechanisms. The way a B1 applicant arrives at that can be one of two ways. First, they are presenting at the United States border, and they do not have the documents necessary to enter the United States. They are outright inadmissible on that basis, and they would normally be subjected to expedited removal. However, B1 adds in an extra layer of protection for those individuals who an immigration officer can determine at that moment does not possess the requisite documents under the country, that is, going through a credible fear process. And if they go through a credible fear process and there is a positive determination at the end of that, they are entitled to remain in the U.S. pending their removal proceedings. And alternatively, as MS recognizes, DHS maintains overarching discretion to place a B1 applicant into standard removal proceedings, citing not Section B2, but instead Section B1 and a BIA decision, ERM, which states that DHS has discretion to place B1 applicants into standard removal proceedings. The alternative is if you are a B2 individual, you are presented at the border, and there is some doubt you are potentially inadmissible, but an immigration officer is not sure, that's when there are removal proceedings instituted to determine whether or not that person is in fact admissible, is clearly and without doubt admissible into the United States. If that is found, the inquiry ends and the person enters the United States. But B1 sets up certain protections aligned with the United States non-discretionary non-refoulement obligations to ensure that those individuals who arrive at a border, an immigration officer determines, have no documents and are clearly inadmissible into the United States, then have some kind of recourse of not being summarily sent out of the country, but instead may go through some kind of asylum or CAT claim in order to avail themselves to the protections of the United States and not be returned from harm outside of our boundaries. Going back to the right to counsel claim and bifurcating the extent to which it relates to the return to Mexico versus removal overall, I understand your argument to be that this is a total deprivation, and that would state a claim in violation both of the statute and constitution as to removal. But even a total deprivation claim, why couldn't that be raised in the course of removal proceedings? It could be raised during removal proceedings, but there is nothing that a court of appeals eventually on PFR could do or that the BIA could do or that the IJ could do, because it is a custody determination that is outside the province of an immigration court. And by the time that it reached a court of appeals on PFR, it strikes me that there is nothing that a circuit court of appeals could do to reverse that harm that occurred months, years prior. We would just need an altogether redo of the removal proceedings, which would thwart the judicial economy. And another way to answer your question, Judge, is that there are other types of advice that are tied into an attorney-client relationship that do not bear on removal. For example, we have a minor six-year-old child here. Counsel could determine that that child is eligible for SIJS status, and that is an application that is not filed in an immigration court. And if counsel cannot have a sensitive or an in-person conversation regarding very sensitive, traumatic past occurrences that a six-year-old child incurred, there is no way of helping that child outside the confines of a removal process. So it's more than just the ability to be represented at removal proceedings. It's the ability to be represented altogether at that point. One other question on the CAT claim. So A-4 in its jurisdiction stripping has except as provided in subsection E? Yes, Your Honor. And subsection E seems to carve out the opportunity to seek relief for things like certain programs in District of Columbia. Does your claim fall into that category? That is, perhaps it is a carve-out and is an exception, but there's a different place that you're required to go? I think that section E, Your Honor, does not bear on this case. We're not asking for affirmative relief that is available through discretion, for example. We're asking for a violation of our non-revolvement obligations not to occur during individuals' removal proceedings. And that's detached from a discretionary relief determination. That's just something that we think should be part and parcel of the non-revolvement obligations, that you do not leave the United States by force, absent some minimally sufficient rights and procedures to protect against an erroneous removal or return outside the United States. Thank you very much. Thank you, Your Honor. Mr. Ramkumar. May it please the Court, Archie Ramkumar for the appellees. This Court should affirm the decision below because the District Court correctly concluded that it lacked subject matter jurisdiction over appellant's FLORA settlement agreement claim, appellant's right to counsel claim, appellant's non-refoulement claim, and because the migrant protection protocols are statutorily authorized. Why isn't this just, at least as to the migrant protection protocols, simply a challenge to a custody decision as opposed to removal? Well, in terms of the jurisdictional issues presented, Your Honor, the government's position would be just taking all the claims in turn, that first with respect to the FLORA's agreement, subject matter jurisdiction cannot be created by consent. With respect to the right to counsel claim, appellant's claim is not that they're right to counsel during the course. But I'm just talking about the challenge to the programming. It seems like she's talking, they're talking more about custody, are they not? How you're treated during this process, where you're housed, you're sending to Mexico, that seems to be significantly removed from, okay, we're going to determine whether you belong in the United States via an asylum or CAT claim. This is the process by which you're treated in the interim. So if I'm understanding your question correctly, the government's understanding is that the custody claim is a component of the FLORA settlement agreement claim, but not the remaining claims being asserted in this case. Turning first to the FLORA settlement agreement. I'm sorry, I'm not trying, I understand. I'm thinking of it as a classification issue. There may be a claim both under the FLORA's agreement, but there's also the claims about statutory authorization, for example. I mean, this goes to B-9, right? And why isn't this analogous to Jennings in terms of detention? It's conditions in which these non-citizens are kept, and it is essentially unreviewable. How do you distinguish this situation from Jennings? Is your question specific to the statutory claim or all of the claims? Well, it's really to the first three, and specifically B-9 is applied to their second and third. Right. So the way I want to answer that question is to essentially briefly go through the government's understanding of what the claims are in this case. So as applied below and asserted below at the preliminary injunction stage, and the court can observe this at pages 319 to 320 of the joint appendix, the right to counsel claim was specifically the burden on the counsel relationship in the removal proceeding. And on the record, the district court explicitly said that this right has nothing to do with MPP, but in fact was a burden on the relationship subsequently during the course of the appeal to the BIA. And with respect to the classification decision, the government's understanding is that this claim had two components. So below, and the court can see this primarily at page 346 of the joint appendix, that appellants asserted that they were erroneously placed in full rather than expedited removal proceedings. They appear to have disavowed that component of the claim on appeal, but appear to nonetheless state that the statutory authorization is lacking for MPP. Now, with respect to that latter component, the government does not believe that that necessarily goes to a custody determination, but that B9 strips the court of jurisdiction over the first component of the claim. And the reason is, as the district court found, that's a discrete action taken in conjunction with the removal proceedings. So your position is not that you couldn't have a right to counsel claim that was independent of the sort that was being discussed here, advising the six-year-old in SJS status, et cetera, but that you just don't think that was pled here? I think that's right, Your Honor. I think the right to counsel claim here was explicitly framed as being intertwined with the removal proceeding. If there were a different right to counsel claim limited, for example, to the non-refoundment interview, and it was made clear that there were no subsequent effects on the removal proceedings, that would be a very different claim, but that was not the claim raised here. Well, I think you run into a problem, because the fourth claim, when you drill down to it, really looks like, I mean, call it custody, detention, exclusion to Tijuana, but whatever it is, the fourth claim, the APA CAT claim is about the harm they're going to suffer in the interim, just as in Jennings. So your logic might or might not work for the right to counsel one, but it cuts against you on the CAT one on the harm they would suffer in Mexico in the interim. It's now or never for review on that one. So with respect to the CAT claim, Your Honor, the government's arguments are different, and the district court's analysis on that point was different than B-9. The district court concluded that 1252-A-4 stripped it of jurisdiction, and the government noted that 1252-A-4 strips this court of jurisdiction in conjunction with other jurisdiction-stripping provisions, and I want to focus acutely on Section 1252-A-4, which is unequivocal in stating that claims that the CAT was violated must be brought in conjunction with a PFR, and further support for this is seen in the Foreign Affairs Reform and Restructuring Act, specifically Section 2242. Now, appellants specifically invoke FARA on page 39 of their opening brief and Section 2242-A as stating that this is where the protections against the Convention Against Torture are enshrined. But Section 2242-D of FARA states specifically that no part of FARA shall be understood as conferring upon any court judicial review to review any claims except in accordance with Section 1252. So the government would submit that those two provisions in tandem make it clear that the CAT claim has to be raised in conjunction with the PFR process. Could there be a PFR for this? This is not a permanent removal. It's a temporary placement back in Mexico. So how could they file a PFR here? So, again, Your Honor, I want to just focus in response to your question specifically on the claim being pled here and below and on pages 401 to 402 of the joint appendix. So primarily below, the non-refoundment claim was that it was arbitrary and capricious for the government to require individuals to affirmatively state a fear in order to receive a fear assessment interview. Now, that part of the claim is completely moot, and appellants do not suggest otherwise. So the only part of their claim that remains is that the return to Mexico violates the Convention Against Torture, and the government would submit that the text of Section 1252A4 in conjunction with FARA evinces a congressional intent not to make return decisions judicially reviewable. And for further support, the government would rely on the rule of non-inquiry and the extradition context. What about the APA angle here that is not the CAT on its own, is that the government is violating the APA? So the response to that, Your Honor, would be Section 1252A2B2, which strips courts of jurisdiction over discretionary determinations. There is no dispute that return determinations are discretionary, and the government cited in its brief cases applying the logic of Section 1252A2B2 not to the ultimate discretionary determinations themselves, but also to the procedures being utilized to arrive at those determinations. Now, in this case, there is no allegation that the non-refoundment procedures prescribed by the Migrant Protection Protocols were not utilized. They were followed, and appellant's suggestion or assertion is that they were simply insufficient. But under Section 1252A2B2, this court lacks jurisdiction to review those procedures, and the same would be true of the rule of non-inquiry. Just briefly on that last point, the reason applicability of the rule of non-inquiry is appropriate here is because returning back to FARA, FARA places both temporary return and extradition on equal footing in Section 2242A, and then Section 2242D makes clear that the decisions are not judicially reviewable except in conjunction with a PFR, and that would be an additional reason to apply the rule of non-inquiry here. But isn't the point as to both, it's not discretionary, the claim, without getting into the merits, but the claim is that this return is in violation of treaty obligations. So, Your Honor, I would agree that is one component of the claim. I was answering Judge Beeb's question with regard to the APA and specifically with respect to the procedures. So with respect to the ultimate results of the return decision itself, the government would again return to Section 1252A4, and specifically the fact that the plain text of that provision bars judicial review of claims precisely like the claim that was pled below. So if the Culejes are contesting the procedures relating to their return to Mexico, how can we ensure those claims are reviewed? So in this particular case, the claims that were raised or pled were very narrow. There was no habeas claim, and the only due process claim was raised in connection with the right to counsel. Without seeing the full universe of possible claims, there may be other claims or other extreme circumstances where review may be warranted. This Court's precedent has noted, for example, that the rule of non-inquiry is not appropriate in extreme cases, but the government would submit that this is not an extreme case because the non-refoulement process has prescribed procedures, and those procedures were followed here, namely an interview with an interpreter, a written transcription, and supervisory asylum review. And so under both the rule of non-inquiry and Section 1252A2B2, the procedures would not be reviewable. The rule of non-inquiry being what? The rule of non-inquiry, Your Honor, essentially states that if there are procedures in place and they are followed in conjunction with a discretionary determination, then the Court's review shall have reached its end. And the government would cite primarily to the Trinidad case out of the Ninth Circuit, which makes that exact point, albeit in the extradition context. But for the reasons I've already stated, the extradition context is an appropriate analog here. And isn't it a case that's never been explored outside of the extradition context? So the government would submit that in the Munaf versus Guerin Supreme Court case, though the rule of non-inquiry is not explicitly mentioned by name, the principles underlying the doctrine were arguably applied in that case in a habeas petition where the petitioner again claimed that transferred Iraqi custody would result in his torture. I briefly want to return back, if I may, to the right to counsel claim and specifically this Court's decision in Shahaze. It's important to note, I think, at the outset that both parties agree that the appropriate framework for assessing that claim is whether or not the claim is ancillary or collateral to removal proceedings. And as the government noted in its brief, extending Shahaze to this claim and this case would not only create a circuit split, but there are additionally four reasons why it should not be applied here. First and foremost were the unusual circumstances of that case, that 666 F3rd at 121, and this Court specifically emphasized that and the fact that the claim could not be efficaciously raised in the course of administrative proceedings. Now that is not the case with respect to the right to counsel claim as it was applied below, namely that the transfer to Mexico would burden the right to counsel and detrimentally impact the fairness. But the holding of Shahaze is pretty broad, is it not? It is, Your Honor, and that gets to my second through fourth reasons. The second reason is that in Shahaze, this Court relied extensively on the Ninth Circuit's decision in Singh v. Gonzalez, but subsequently the Ninth Circuit issued JEFM and cabined Singh to the unique facts of that case because Singh, like Shahaze, involved a unique situation where the claim could not be efficaciously raised. But again, that is not the case with the right to counsel claim considered in Aguilar and JEFM and here. Third, as a practical matter, and the government noted this in its brief, if a final order of removal were required in order for Section 1252b9 to apply in the first instance, then the provision would essentially be rendered a dead letter. And the reason for that is claims that arise from removal proceedings, which is the statutory language, necessarily only accrue prior to the entry of a final order of removal. So if Shahaze's holding were extended, then at that point, all Section 1252b9 would reach would be the final order of removal itself. At that point, however, the provision would be entirely duplicative of Section 1252a5. And finally, the government noted this point briefly on page 37 of its brief, extending Shahaze outside of the unique circumstances of that case would essentially resurrect the very state of affairs Congress sought to eliminate when it enacted Section 1252b9, namely piecemeal and fragmented litigation over claims that are clearly tied to the removal process. But the core takeaway with respect to the right to counsel claim is that appellants explicitly admitted below under questioning by the district court that the harm would be to the fairness of their removal proceedings, not to the MPP proceeding itself. And that concession is... Where did they say that they were not making any claim as to right to counsel as applied to these other claims that they're raising? So I would return back to the citation I gave you along with the framing of the issue both below and on appeal, Your Honor. The framing of the issue on appeal has been that the right to counsel relationship will be burdened if the clients are transferred to Mexico, and in turn, the fairness of the proceedings before the BIA will be detrimentally impacted. And that claim is inextricably intertwined with removal proceedings. And I finally want to return, if I may, back to the statutory claim. Sorry, what about the argument they've made? And I'm sorry, Rick, can you tell us where in the appendix you say that below they limited their right to counsel claim only to the harm to the removal proceedings itself? So I would rely primarily on pages 319 to 320. And specifically on page 320, there's a colloquy where the district court asks what the harm is to the counsel relationship. And the response is the harm is the fairness to the removal proceedings. And then on page 319, the district court says, so this doesn't have anything to do with MPP. And they argued a few minutes ago that it's really a claim of the complete and total deprivation of counsel, something that would be effectively unreviewable by the time it got to PFR. What's your response to that? So my response, Your Honor, and it piggybacks on several points I've made, is that if the underlying claim, which it is in this case, is that the fairness of removal proceedings will be detrimentally impacted based on the burden on the counsel relationship, that claim can be raised in a PFR. Specifically, they are free to argue to the court of appeals that the removal proceeding itself was rendered unfair by the burden on the counsel relationship. There's no bar on efficaciously raising that claim, unlike the claims at issue in Shahazeh or even Jennings, for example. I see that I'm out of time, but I briefly- That's fine. But why don't you, if you could go into the Flores settlement issue. Certainly, Your Honor. So returning back to the beginning of my argument, so the principle underlying co-conin and the lower court decisions applying co-conin that the government relies on is that subject matter jurisdiction cannot be created by consent. And the district court recognized this very point on pages 7 to 8 of the joint appendix. And indeed, one court in the Southern District of California has relied on this very reasoning to find that it lacks jurisdiction over Flores settlement agreement claims that are identical to the claims being asserted here. But you admit, the U.S. government's being a party makes it different, and the U.S. government's being a party means federal common law applies to these agreements. And that's a basis for federal jurisdiction, isn't it? So two responses on that point, Your Honor. So first, we would not agree that it makes it different, and we would cite to a number of cases in our brief where the United States or one of its agencies were parties to a consent degree, yet nonetheless courts found that they lacked federal subject matter jurisdiction, again, for the reasons articulated in co-conin. Which case found not that they had jurisdiction in venue A, but that they lacked jurisdiction in venue B. So the government believes that Munoz versus Mavis out of the Ninth Circuit stands for that proposition, and the slaughter case out of the Eleventh Circuit, I think, is a really good illustration. So that case concerned a consent decree entered in the district court for the District of Columbia, and a claim was brought to enforce that in the Middle District of Georgia. And the Eleventh Circuit said that subject matter jurisdiction was lacking in large measure because of the principles elucidated in co-conin. Why isn't that really a venue question, as your friend on the other side says? And I would come back to the fact that it's not a venue question because subject matter jurisdiction cannot be created by consent, even when the United States or its agencies is a party. And I would also submit that this question of federal common law, the Flores Settlement Agreement was not created by federal common law. Judge Gee put the point succinctly in her most recent opinion on September 27th, that it is a creature of the party's contractual agreements. But your friend on the other side makes the point that the wording of 1331 is the district courts shall have jurisdiction. They're understood as a collective court system. And then where it goes within that system is not regulated by statute. So doesn't that suggest that the court system as a whole has jurisdiction over this, and then why don't we treat the subsidiary question as a venue one? So I just want to make sure I'm fully understanding your question. Is your question that because the Central District of California has subject matter jurisdiction, that that conclusion should apply throughout the federal courts as well? The district courts as a whole have subject matter jurisdiction. When it arises from the agreement, we may have special rules when it comes to contempt of court, but in general, why do you resist your friend's suggestion that it's the district courts as a whole that have subject matter jurisdiction, and then however we chop that up is really a matter of venue? So the response to that is that the judge in the Central District of California did not exercise subject matter jurisdiction over the Flores case based on the Flores Settlement Agreement. The claims at the outset of that case were facial allegations that regulations were being violated in federal constitutional claims. And then in paragraph 35 of the FSA that was subsequently entered, the district court noted that it explicitly retained jurisdiction while the case was pending before it. But because its jurisdiction was not founded based on the Flores Settlement Agreement, the fact that Judge Gee has subject matter jurisdiction does not provide that the court below has subject matter jurisdiction. Why doesn't the agreement itself give rise to federal rights? The government has entered into this agreement and has committed as part of the agreement that what it has in the agreement actually supersedes INS policy. Why isn't that, does that become as much a federal question as the INS policy that's been superseded and could have been challenged elsewhere? Again, I would just return back to the fact that courts have generally embraced the principle that subject matter jurisdiction cannot be created by consent irrespective of the principles and the terms of the FSA. And I would also note that the reading of paragraph 24B proposed by the other side is unnatural, namely that jurisdiction refers to personal jurisdiction, not subject matter jurisdiction. They make that point in their reply brief, I believe, for the first time. But the last sentence of 24B says, In such an action, the United States District Court, in this case outside the Central District of California, shall be limited to entering an order solely to effect the individual claims of the minor bringing the action. One could argue from that that it's like, okay, go wherever you want. And that court, you know, it's limited as to what it can do, but it certainly can do that with respect to the individual claims of the child. In response, Your Honor, I would return back to the phrasing of section 24B, jurisdiction and venue over the matter, as the district court found and as the government presented in its brief. The most natural reading of that phrase is that it refers to subject matter jurisdiction because that is consistent with the general principles that I've outlined just now, namely that an independent basis for federal question jurisdiction is necessary in order for a claim to enforce a settlement agreement to arise under federal law. Well, I mean, the prior sentence that you referred to may seek judicial review in the United States District Court of Jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance. So in other words, if you're placed, if you challenge your placement and you're in Pennsylvania, what's wrong with a federal court in Pennsylvania making a determination as to whether that challenge can take place or it's limited to in order to affect that particular child, as I just quoted from the last sentence? The government would submit that an independent basis for federal jurisdiction would be needed in order for the entry of such an order. I know that I've drastically exceeded my time limit, but I would agree. You're fine. You're on time. A question or two. Your answer to me about the precedent from our sister circuits that suggested that there was no jurisdiction, you cited Munoz and Slaughter, and your brief has a third one, Schaefer. I see that your friends in their reply brief say Munoz and Schaefer are both sovereign immunity cases, and Schaefer has the additional wrinkle that it was the Federal Circuit, little tucker act channeled this in a way to the court of claims. So you perhaps rightly didn't mention it at the lectern here. And then Slaughter was an unpublished per curiam decision where the district court had reserved jurisdiction and enforced consent decree violations only to itself. So we don't have a sovereign immunity issue here. We don't have a district court that's reserving jurisdiction to itself. We have a district court that's entering a Flores settlement that purports to say jurisdiction's over here. So why are those cases on all four with us? You asserted there would be a circuit split, but I don't see the circuit split. So three responses on that point. First, the government's assertion of a circuit split was limited to the right to counsel claim specifically, not this claim. Second, the Munoz case, although it largely concerns sovereign immunity, this is at 630 F. 3rd of 863. The Ninth Circuit specifically notes that the result it reached accords with the Supreme Court's decision in Coconin and specifically the principle that an independent basis of jurisdiction from the federal source of the underlying claim is needed. So, in other words, the Ninth Circuit did a sovereign immunity analysis, but then concluded that the principles outlined and elucidated in Coconin. There's a sovereign immunity case with an aside at the end that favors you. What else? And then, again, the Slaughter case out of the Eleventh Circuit, the government would also point to the SMMM case, citing Munoz to find that it lacked jurisdiction over this very Flores settlement agreement claim, and finally would also note that the only case the other side appears to rely on is WSR, but importantly, WSR did not find jurisdiction based on the reasoning that appellants proposed. Instead, WSR found jurisdiction primarily based on the fact that Judge G initially had, or the Central District of California initially had jurisdiction when the Flores claims were first brought. And, again, as I've already explained, because those claims were not predicated upon violations of the Flores settlement agreement, that reasoning is erroneous and inopposite. And I briefly want to touch on the statutory claim, just kind of circle back to where we first started. So I mentioned at the outset that there- Statutory claim to what, to counsel, or what? The statutory authorization of MPP, because, Judge Krause, as you mentioned, the government urged affirmance on alternative grounds with respect to the second component. I want to briefly touch on that, if I may. On the merits, not on jurisdiction. Got it. Right. Just, and again, to be clear, just with respect to the second component of the claim. Now, the government's understanding is that the second component is that appellants conceived that they were properly placed in full removal proceedings, but that, nonetheless, MPP is not statutorily authorized as to them. Now, the government would submit that affirmance on alternative grounds is appropriate for two reasons. First, that's a pure question of law, not dependent on any further factual development. And, second, both parties briefed that issue below and on appeal. So the government submits that the issue is squarely before this court. On the actual merits itself, the government submits that the dispositive concession is on page 20 of appellant's reply brief, which is that the contiguous return authority adduced in section 1225B2C can be applied to applicants for admission inspected under section 1225B2. It is uncontroverted that appellants were inspected for admission under section 1225B2, and that settles that issue. Now, a moment ago, appellant's counsel mentioned the credible fear process. That is a complete non sequitur, and the reason is it is, again, undisputed that none of the appellants in this case underwent the credible fear process because none of them were placed in expedited removal proceedings under section 1225B1. Indeed, even Jennings made the point that applicants placed in section 1225B1 are subject to an initial determination. The word determination is in the statute in both section 1225B1 and section 1225B2, and that antecedent determination, not any innate characteristics of the alien, in large measure governs the statutory authorization claim in this case. So for those reasons, the governor would submit that MPP is statutorily authorized. If there are no further questions from the court, the government is happy to rest on its papers. Just one final point that I forgot. As a practical matter, moreover, the MPP guiding principles provide that individuals placed in expedited removal and found to have a credible fear will not have MPP applied to them. So as a practical matter, that scenario would not occur. One quick question. We had asked counsel about the potential mootness issue. I gather the government is not suggesting that there's mootness to the Flores claim, given the injunction. No, Your Honor. The government's understanding is that the provisions of the agreement remain operative because the regulations promulgated were enjoined. Thank you very much. Counsel, could I ask you to start with the record? Your friend on the other side made some assertions about specifically what was and wasn't applied and directed us to join Appendix 319, 320 on the right to counsel just being statutory and just being about removal proceedings. I think he made some references to what was preserved at 321 and 322. Do you agree or disagree with your friend's characterization of the record? Walk us through, if you have a different view, where and why you have a different view. Your Honor, I do disagree. I think it would be disingenuous for us to state that the termination of an attorney-client relationship would not have an adverse impact on the overall removal proceedings. However, throughout the proceedings, we pled as this would be a complete destruction of an attorney-client relationship posing an independent legal harm, for example, in the briefs at JA73. Sending plaintiffs to Mexico at minimum would be a substantial burden on the relationships. At worst, it would terminate the relationship. Plaintiffs are unable to obtain counsel in Mexico to represent them in U.S. removal proceedings. American lawyers are unlikely to travel to Mexico to represent them on a pro bono basis. Similarly, at the preliminary injunction hearing, JA228, return to Mexico for this father and his six-year-old daughter would be an enormous obstacle for the continued legal services provided by our offices and advocates and would likely lead to an impossible attorney-client relationship between myself, this father, and his child. So our singular concession that perhaps to the extent that this attorney-client relationship termination would have an overall impact on the outcome of the removal proceedings, we would concede that. It will, but we do allege an independent legal harm that is not channeled by subsection B9. And if I also may, Your Honor, if there's no further questions about the right to counsel, I will quickly clean that. You did not make below this argument about the ability to confer with a six-year-old over SIJS status, et cetera. You're spelling that out in detail now, but it's not something you mentioned below. That is correct, Your Honor. That's just an example of the unpredictable and unfair results that would stem from this kind of a holding supported by the district court and the government. And then also an individual is not, going back to the statutory authorization for MPP, an individual is not inspected and processed under B2. An individual is inspected for admission into the United States, and based on the determinations of that admissibility determination, you either are B1 or you are B2. That is static. And these individuals, it is uncontested, they were inadmissible based on one of the grounds expressly enumerated at B1, that being they had no documents and were admissible under 1182A7. The government conceded that at JA355 of the preliminary injunction hearing. And if I may also ask if Your Honors would like to hear my colleague speak about the issues raised in your letter regarding Flores v. Barr, or are you fine that we rest at this time? Is there anything further you wish to add, Mr. Wood? Briefly, Your Honor, based on the government's apparent concession that there's no mootness issue, I'll take only a little bit of time. This goes to the question of merits. This goes to the question of whether the government has discharged its obligations under the agreement. The district court found that the answer was no, issued an injunction. The government has neither sought a stay of that injunction nor yet filed a notice of appeal on that case. If the issue were to come up below, we would view the government as bound through issue preclusion by the findings of the final judgment of the district court and the assembly district on that issue. Thank you. Thank you, Your Honor. As I've done earlier today, if I could ask the counsel to get together and have a transcript prepared of today's oral argument and split the cost if you would. I want to thank counsel, all of you, for being here today. It's an important issue and very, very well presented. Thank you.